May it please the Court, I represent the appellant, Ronald Wilkins, Chaplain of the United States Navy, who is appealed to you from the District Court's decision granting summary judgment to the Navy. Am I correct that the claim here is about him being selected for early retirement, so whether he was improperly passed over for promotions earlier in his career is not before us? That's correct, except for this fact, Your Honor. He was reviewed below the zone. And part of his challenge is to the composition of the selection board, which is the same policy which also composed the promotion board which reviewed his record below zone. I just got lost again. Okay. Here's my thought. I've got to figure out what the case is about. I think it's about his being selected for early retirement. That means it just doesn't matter to this case whether he was improperly not promoted. And if I understood the answer, it was yes, but, and then I didn't understand the part after the but. Why does it matter? Because the policy of which he challenges under the, that composed his board, was the same policy that directed how the promotion boards were also composed. I don't, I don't see, Judge Kleinfeld, I don't see that connection. Because we're dealing, he had, he received his promotions along the way. There was some objection to the way in which he got his promotions along the way. But basically what brought you into court was early retirement. Yes, Your Honor. That's right? Early retirement. Yes, Your Honor. He's challenging a policy which granted a denominational preference to one denomination for 26 years. As I indicated on the chart here, this is shown in the Executive Record, every board from fiscal year 77, every board that selected chaplains was, had one Catholic on it if it did not consist of admirals. Why should we care if it's not a promotion case? Let's say all the promotion boards, they're all Catholics. No non-liturgical Protestant or Protestant of any kind has ever been allowed on a promotion board. 100% Catholic. Why should we care when a plaintiff's claim is for being selected for early retirement? Because the precedent in this circuit, as I understand it, is that evidence of prejudice in other parts of a defendant's operations are also relevant to whether or not prejudice occurred in a specific act which is challenged. Now I understand the contention.  Yes, Your Honor. And that also relates to why the discovery at 59. Now I understand. Because if the policy is unconstitutional under for promotion. Let me ask you this. We are focusing on, you can't get over it, though. We're talking about early retirement. Yes, Your Honor. But if the policy. So what were the statistics? Your Honor, part of the problem that we challenged is the denial of discovery. Okay. The criteria for that the board was supposed to use was based on retention. And what the statisticians looked at and focused on was who was separated. If you look at the, I've indicated there because we were dealing with this case, the ability to continue discovery in subsequent cases, we can show that when you look at the population that's affected by this process, you actually see that Catholics are protected versus people like Chaplain Wilkins. And the point that we try to make, and the linkage to the promotion system, is it's the same policy. They use the same criteria. So it's unconstitutional to protect and give a seat on a board for a denomination on either selective or promotion. It's unconstitutional. I'm not following something here. You've got to catch me up before you finish that argument. I thought the statistics showed that non-liturgical Protestants were selected for early retirement less frequently than Catholics and liturgical Protestants. Is that right? That's what it looks like at first blush. And what we are saying is that had we been allowed to get discovery. Well, you had discovery for years and years. Your Honor, this information was denied to us, and the reason why the government tried to strike Dr. Luba's declaration was that the only reason we got this is I went to the council in a previous chaplain case called Skerm, went through the records, and got it. The record shows that discovery dispute was ongoing, that we had not gotten information from the government. What statistics are in the record? Is it true that the statistics in the record show that non-liturgical Protestants are selected for early retirement less frequently than Catholics and liturgical Protestants? That's what is in the record, Your Honor. That is correct. But I would like to point out that in this case, Wilkins is saying that he was selected under a disparate treatment. Let's say that you write about the board. Let's hypothesize or imagine a board. It's all Catholics. They don't let any non-liturgical Protestants on the board that selects people for early retirement. If, nevertheless, what the board does is basically discriminate in favor of non-liturgical Protestants, wouldn't that vitiate the case? No, Your Honor. I strive to say what I think the rule in this circuit says. It cites in a case called Ward v. Westland Plastics that the Supreme Court, citing McDonnell v. Douglas, has cautioned against giving controlling influence to statistics. Regardless of how devastating or reliable the statistics may look, the issue remains in these cases, like Wilkins, whether a particular isolated historical event was discriminatory. Well, I thought your challenge here was you brought a broad-based systemic challenge. His systemic challenge included not only the selectability of retirement, but the promotion boards. Okay. But it was a systemic challenge, not that they intentionally selected him because he was non-liturgical. Both, Your Honor. His complaint says he was pre-selected. And that's the point we tried to make to the district court, was that the preset concerning the selectability of retirement board focused on retention. Your Honor, you gave us these little charts here. Okay. I'm trying to. Okay. I don't quite understand your point. You brought a systemic challenge. Your Honor, if you look at the last chart, systemic challenge, but it's also an individual challenge. His complaint is he was pre-selected because in retaliation. What does pre-selected mean? That means that before the board convened, the people that were running this, notably Admiral Holderby, had already determined that Wilkins was going to be the one who left. You mean they decided to dump him and then they had the board to put a rubber stamp on it? Is that what pre-selected means? Yes, Your Honor. Because he was non-liturgical. No, because of his reputation as a troublemaker, because he challenged. Then they didn't pre-select him because he was non-liturgical. They selected him because he was a pain. Your Honor, you can be a pain, but you tend to be more of a pain if you're a non-liturgical, if you're a conservative Christian like Chaplain Wilkins. He believes that his job is to represent those like him, and that's why that drives him to say, wait a minute. This is wrong. Well, I could have brunt on him. He could have sat back and said, hey, do whatever you want. Closed down the congregation. He said no, and that's why they moved him out. So the systemic challenge is that all non-liturgicals are a pain? No, Your Honor. Then I don't, you know, I just really don't understand your argument. Your Honor, the argument is that non-liturgicals, if, for instance, if you look at the promotion data, they wind up at the bottom. And if you look at the last chart, for instance, in this case, you will see. This is candidates before FY95, Chaplain Commander's SER Board? Correct, Your Honor. What does SER mean, incidentally? Selective Early Retirement. It's a process where people who have necessary time in service are selected for retirement. It's an involuntary retirement. They say, here's your walking papers. I just needed to know what the abbreviation meant. And there were 13 people on this list who had multiple failures of selection. That's another term of art. That means you haven't been promoted. And that's a determination by the Navy that your potential is limited. And these instructions, which are given on the previous page, talk about you must ensure that those retained have the highest potential for future service. Now, they retained seven people who had multiple failures of selection. They retained two of them, one of which is a Southern Baptist who was a non-liturgical. And our contention is that they substituted Wilkins just to keep the balance. Because Palmer has almost as many failures of selection as Bertrand, the Catholic, and both of them have less than two years of service remaining. In fact, neither of these people, Palmer nor Bertrand, appeared on the next Selective Early Retirement Board. That's contrary to keeping those with the highest potential for service. But the district court was presented with a denominational preference. And she recognized that she had to apply strict scrutiny. And she said that he failed to meet his burden. Incidentally, is there some decoder somewhere in the record? I look at this. I don't know what PUSA means. I don't know what FGC means, CDR, FOS. You just told me what SER means. I don't know what CDR means. I don't know what FGC means. Your Honor. I don't know what any of this stuff means. Is there a decoder somewhere here? Your Honor, things like CDR is commander. That's in the glossary in the brief. I believe that there's a table somewhere in the record that gives. These are denominations, PUSA, Protestant, Church USA, Southern Baptist, Southern Baptist. The point I wanted to make was that the district court was faced, recognized she was faced with a denominational preference, and said Wilkins didn't meet his burden to show that there was an intent. That's not the burden that, Wilkins has no burden under strict scrutiny. It's the government's burden. And then the test for strict scrutiny is, is there a compelling purpose, and is it narrowly tailored? His board was composed under this one Catholic on every board policy, and he challenged that. He also challenges the delegation of the sovereign's authority to make career-ending decisions to people who are hired and paid as denominational representatives. That's a legal question. And he shows, and that's why the promotion board information is important, because it shows that denomination counts, and that's also shown in Dr. Luba's report. That the delegation of the sovereign's authority to those people who make these decisions is without any limitation or accountability. That, again, is a legal question. That's not answerable by the BCNR. And even if the BCNR could address his question about whether or not he was retaliated against, he is still in the same position of Captain Glynes, who was the plaintiff in Glynes v. Wade, in which this Court said that even if the BCNR gave him all of the relief that he requested, he would still be subject to the same discriminatory policies that he challenges. And that's why the Court's decision that he could, he had to exhaust his administrative remedies is improper, and it is the precedent of this Court. Kennedy. What relief could the BCNR give him? What relief could it not give him? Give him. First, what could it give him? I'll ask the next question after that. Your Honor. What could it do for him? It would not give him relief in terms of his retaliation because there is no evidence. And the district court held the only people that can provide evidence of what happened on his selective early retirement board were the board personnel. The government has denied discovery of those personnel. That discovery never happened. In fact, that was part of the reason why we requested that we be allowed to continue discovery on why there was a 56-F motion. That information is critical to his claim because the BCNR has to look at evidence. It has no power to direct the Secretary of Navy to release people from their oath of secrecy. So he challenged it, and even if it said, yes, there is some evidence here that you were preselected based on a failure to follow that, he's still subject to the one Catholic or the delegation of the sovereign's authority to the to a denominational representative. And according to Curious Joe L. v. Grumet, that's a delegation of discretionary civic authority to persons who are defined by their religious identity. You wouldn't have any chaplain on the board, on the selective board? Your Honor, we would have chaplains if they're – if the Navy followed the directions or the suggestions of its own consultant. It said, gee, you ought to expand the board members, or if it followed the directions of Judge Thompson in 1985 when he found the two Catholic policy unconstitutional, he said, add more chaplains. What we want is accountability. That means more board members so one person cannot veto the career. That's in the record. The Navy's own investigation showed one person can kill a chaplain's career with no accountability. Are we talking about promotion now? The same, Your Honor. It's the same system. It's the secret system that so much people – But you didn't answer my question. Yes. Are you talking about promotion? And selective early retirement, Your Honor. It's the same system. Are you saying one person can pick a person for early retirement, even though no one else on the board agrees? Yes, Your Honor, because they have to vote for retention. And retention, it's like promotion. They get – you get each – Does it have to be unanimous for retention? Your Honor, we don't know. But in promotion, everybody votes. And so if – at the end point, you have to have almost a unanimous, you know, 100%. So if one guy puts zero, that means he will never make his – he will never get selected. And this is the question. Your Honor, I'd like to reserve my time for it. Thank you. Thank you. Good morning, Your Honors. I'm Louis Yellen from the Department of Justice. With me at council table is Lieutenant Sergio Sarcone from the Navy JAG Corps. We're here today representing the United States. I may be alone in this, but my only language is English. Yes, sir, you are. I can't understand it. I will promise you I won't use any acronyms. I'm sorry. Are you telling me you can't hear me, sir? No, I mean just what you said. Yes, sir. I promise I won't use any acronyms. I'd like to begin by saying Mr. Wilkins raised a number of challenges. The first challenge, and what I take to be his principal challenge, is a systemic discrimination claim. The United States Navy put into evidence statistics that showed that, in fact, in the year of his early retirement board, non-liturgical Protestants were, in fact, slightly favored over other faith group clusters. And for the years, the entire years that there were selective early retirement boards, there was not a statistically significant difference among retirement rates within these boards. Despite having an extremely long time for discovery, Mr. Wilkins put in zero statistical evidence concerning retirement, zero statistical evidence. Is that true? Before summary judgment, there was no statistical evidence put in by the other side? That's exactly correct, Your Honor. It was ruled without any contrary statistics. On retirement boards. That's exactly right, Your Honor. Opposing counsel did put in some evidence concerning promotion boards. When did Dr. Luba's report come into the picture? That was before summary judgment, Your Honor, and that, again, I'd like to stress, had to do with promotion. So even fully crediting the claims in Dr. Luba's evidence, at most you have some evidence of discrimination in promotion boards. Now, opposing counsel suggested that this Court should rely on its disparate treatment cases and say that, well, if there's evidence of discrimination in one practice, that can be used to infer discriminatory motives in another practice. I point out for the Court that those cases involve circumstances where there isn't any evidence, direct evidence, about the primary process that's in question. Here we have uncontradicted evidence that there was zero discrimination in the retirement context. So even if Mr. Wilkins was able to establish discrimination in the promotion context, that would have no bearing on whether or not there was discrimination in the retirement context. Are there different rules and different criteria that apply to the processes? No, Your Honor. It depends on your level of generality. At the highest level of generality, they're the same rules, principally among them the needs of the Navy and a candidate's ability for future contribution. I point out that from this precept that opposing counsel quotes, this is only half of the equation, the candidate's potential for future contribution. The other half of the equation, which is stressed in precepts, are the needs of the Navy. Now, are the boards made up the same way, the same criteria in selecting the boards? In the time period that was in question here, yes. The Rock Declaration in the supplemental excerpt of record describes how the Navy composed the boards, trying to get individuals from a wide variety of backgrounds and experiences so that they could bring those experiences to the board to have a fuller evaluation of the candidate before them. But it is the same policy generally and the same considerations generally for the two boards. But, again, even if that's the case, Your Honor, as to the statistical, as to the systematic discrimination claim, it doesn't matter if there is some evidence about one practice if you have direct evidence about the other practice, as we do here. I'd like to point out opposing counsel suggests that he filed his Rule 56 motion. He says explicitly in his reply brief, and I think he said in his presentation here, that he filed his Rule 56-F motion so that his expert could analyze data concerning the retirement boards. I'd encourage the Court to take a look at excerpt of record 900-907. That's counsel's affidavit filed with his Rule 56 motion. As the Court knows, counsel party has to explain with specificity what facts are sought to be discovered and how that would be essential to showing a genuine issue of material fact. The affidavit no longer discusses systematic data. It only talks about the need to take depositions of promotion board and retirement board members. This is simply just a mischaracterization of the record to suggest that the 56-F motion was filed to provide information or data about the systematic discrimination claim. In addition to the early retirement systematic discrimination claim, there is a per se challenge, establishment clause challenge, to having any chaplain on a retirement board, as I understand it. I'm a bit confused about the challenge because as I thought I understood it, Mr. Wilkins was objecting to having any chaplains on the board, arguing that that caused an establishment clause violation. But I thought I just heard counsel in his presentation suggest that if there was some different balancing, that would be okay. I'm a little bit at a loss. The governing standard here is whether or not a government practice for a per se challenge like this is whether or not a government practice has either the purpose or the effect of furthering in this case a particular denomination. I think we've shown in our brief, and I'm happy to touch on the issues if the Court would like, that the purposes for the board, as described in the Rock Declaration, are religiously neutral. They're principally for getting a breadth of experience. And the effect we've shown through the evidence concerning the retirement boards is not to promote any particular religion. I have trouble understanding how to use establishment clause jurisprudence with military chaplains. But as I understand it, chaplains in the United States Army existed and were part of the Army before there was a United States Constitution. They're older. So I should probably just forget about it for March. Is that about right? Yes and no, Your Honor. I mean, it may seem a little strange outside the military context at first blush to think about this. How could there be chaplains in the military to begin with? George Washington had them, right? Yes, Your Honor. I think the historical explanation is part of that. And the other part of that is many courts have held that the chaplaincy in general is constitutional because the government has a compelling interest in helping to satisfy the free exercise rights of members. I think it's conceivable that there could be establishment clause problems with having chaplains serve on boards if, for example, a chaplain was directed to use religious criteria to determine whether or not to keep someone. But it is absolutely clear that the criteria here are not religious. They're absolutely religion neutral. And so for that reason, we have neither purpose nor effect under Zellman v. Simmons-Harris. And I just don't think we have a per force establishment clause problem. As to Mr. Wilkins' retaliation claim and the relief that he could get before the Board for the Correction of Naval Records, again, there are two different types of claims. There are the constitutional systematic claims, and then there's the very specific claim of retaliation by a member of this particular board. As to that latter claim, even though counsel describes it as constitutional, and I don't mean that, you know, in any disparaging sense, it's conceivable that retaliation could be a constitutional violation. But it is absolutely clear that the Board for the Correction of Naval Records has the authority to consider retaliation claims and to provide relief. Our brief cites a number of cases, including a Supreme Court case, which recognize exactly this principle. So Mr. Wilkins had the authority. So if there was somebody on the board who said all evangelicals get a zero, he could get relief for that? Well, conceivably, we'd have to – I'm sorry, under your hypothetical, yes, I think that would be a significant problem, yes. If it could be discovered that Admiral Holderby or whoever else Mr. Wilkins is concerned with here had a policy of not considering a person's merit, but just because of their denomination, giving them terrible scores and thereby trying to get them off. The Board for Retirement of Naval – excuse me, for the Correction of Naval Records could consider and could grant relief in exactly that sort of a case, yes, Your Honor. Now, does somebody make a recommendation to the board about whether somebody should go or stay? No, Your Honor. They just get the file and they say, oh, okay, we'll look at this one. Give all our wisdom, he stays. That's exactly right, Your Honor. There's an anonymous vote that's taken. And I'd like to raise – They have all the efficiency reports for the years. Exactly. They have – that's exactly right, Your Honor. They have to do that regularly, as I recall the practice. Exactly right, Your Honor. And these are – the people who sit on these boards are fairly senior – excuse me, they have to be superior rank to the – They all have to be senior to the person who – That's right. And so what that means, among other things, is they've had command or experience in supervising others and in administration, and so have the capacity to review the documents and the efficiency reports that they have in front of them. I'd like to respond explicitly to opposing counsel's claim that the record establishes that an individual can veto or zero out an individual and knock them out of contention principally for that. I have to say, we pointed this out in our brief and the exact citation is there, but the very document that counsel relies on is a report concerning – and I should say it's an internal investigative report, administrative report, which is how these sorts of concerns are usually handled. That report says, based on its – based on the investigator's evaluation, that it is impossible to tell. While an individual vote has some bearing, it is impossible to tell what effect an individual vote can have. There is simply zero evidence in this record to show that one individual can control the fate of an individual on a retirement board or on a promotion board. Last, I'd just like to very briefly point out that throughout this argument, I've been assuming that opposing counsel may have presented evidence concerning discrimination in promotion boards just to show why that has no bearing on the discrimination claim. I'd like to point out that we entirely contest that suggestion. We have evidence in this record, again, showing no statistically significant difference in the rates of promotion among faith groups. Even opposing counsel's expert in this case conceded – and our evidence, I'm sorry, is that the supplemental excerpts of Record 3738. Mr. Roken's expert, Mr. Luba, agreed that our evidence seemed to suggest parity and no statistical significance. But he suggested that there's some other mechanism outside of the promotion process which accounts for what he says is discrimination. But he hasn't explained what that mechanism is. And I'd like to point out that the only thing he could be talking about, as far as I can tell, is voluntary withdrawal from the Navy, because the only way to be involuntarily separated from the Navy, aside from disciplinary separation, would be by failure to be promoted a certain number of times and then being forced to retire that way or being selected for an early retirement board. Mr. Luba, Mr. Roken's expert, is suggesting that there's something outside of that mechanism. The only thing left outside of that mechanism – I'm sorry. To be clear, he suggests that there aren't the numbers of non-liturgical Protestants being considered that there should be. And what that means is that there are individuals who are voluntarily separating from the Navy. But, again, that's not explicit. In the testimony that Mr. Roken's expert gives, he provides no mechanism to explain what sort of discrimination is supposed to be going on in the background here. And he rejiggers the data, compressing different promotion boards into one year to account for what he claims is this background discrimination. The district court quite properly decided that this was not sufficient to create a genuine issue of material fact on any issue. It was fairly described as pure speculation on Mr. Roken's part, and the district court properly granted summary judgment on this remaining claim. Your Honors, I have nothing further, but I'm happy to respond to any questions the Court might have. Thank you very much, Your Honors. Thank you, counsel. Your Honor, first off, I'd like to correct what we said about Dr. Luba. If you'll check on page 1430 to 1431, it's a transcript of the hearing. We specifically asked the district court to continue. We pointed out that Dr. Luba had, in fact, been able to identify where those people went. And, again, it goes to the issue of lack of evidence. They had not provided us information on what's called continuation boards. And from my knowledge of other information, I can now say that he can explain and show what happens to people through this process. He said that it's impossible to manipulate the board. That's not what the DOD IG for Commander Washburn said. I was trying to find the exact page. It's in the reference, because both Chaplain Black, who was the chief of chaplains and testified to the DOD IG, he said one chaplain can manipulate the board. They press a zero, and that means, let's say, if you have five people, everybody could vote 100. That means, and one person gets zero, that's a max 80. And so you'll never get promoted, because that one zero will always cancel out, whatever else happens. Commander Washburn's testimony is also in the DOD IG, or the Naval Inspector General Report. She said she was on six boards. On every board, she saw the same process. She said it was and nobody complained. The DOD Inspector General's report also from the 97 and 98 boards also showed denomination was a preference. Again, one of those boards was headed by Chaplain Holderby, which we felt was also important why we should be able to talk to him. Black, the explanation of why these people are on the boards has never been presented. They say that they need the experience, and we asked the district court, well, ask the government to explain why you need a Catholic there as opposed to a Pentecostal or opposed to a Jew or a Mormon. They said, oh, gee, we have to have this representation of the faith groups or the people in the court. Well, we've presented evidence in the record, and you'll find it in the second, third, and fourth exhibits here, which are in the record, which show the over-representation and under-representation where the percentage is greater than 10%. There was no plan to actually make sure that any faith group was adequately protected or represented, and it's specifically evident when you look at special worship. Now, the question we ask is why do you have to have a Catholic on every board? What do they bring? Because promotions are supposedly based on the record. Assignments are not based on denomination. So when you say I have to have a Catholic on every board, you're saying to everybody else that's important. Section 612 says you must have one representative of the category under consideration. In effect, the Navy's policy made that one person a Catholic, and that is a denominational preference. There is no justification showing that it is necessary for any purpose.  Well, the reason we have to have a Catholic on every board is to protect their Catholic interests. Judge Thompson in Wilkins 1 back in 1886 said the only reason you have them there is to protect their Catholic interests. The rates of promotion. Counselor, your time is up, so you ought to wrap up. Oh, I'm sorry. I thought I looked at that. Yes, Your Honor. Everybody does. I would just like to say to address one point. Counsel is very careful to talk about promotion statistics, saying our experts thought they were the same. That's when you look at in-zone promotions. The ability to control the board is reflected in the fact that Catholics had a above-zone promotion rate of 22 percent versus 13 percent for everybody else. That means one out of every four Catholic promotions came from above-zone, which is not in the statistics which they present. We have statistics that we show when you track people and see what happens. Every category, non-returgicals come last. And the question for an Establishment Clause case is, what's the message? And that's why I had these charts, because if you look and you say, what's the message of this preference? It says that people like my client are out of the mainstream, that they're second-class citizens. They're not in the in-group, to use the expression by Chaplain O'Connor or Justice O'Connor. Your Honor, I thank you. I ask you to reverse the district court's decision. Thank you, counsel. Wilkins v. United States is submitted. We are adjourned until 9 a.m. tomorrow. Thank you.
judges: Kleinfeld, Paez, Hart